IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| ANGELA BROOKS, | ) | C/A No. 3:13-CV-0610-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | FINDINGS OF FACT AND |
| AT&T UMBRELLA BENEFIT PLAN | ) | CONCLUSIONS OF LAW |
| NO. 1, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Through this action, Plaintiff Angela Brooks ("Brooks"), seeks a determination that she is entitled to both short-term disability ("STD") and long-term disability ("LTD") benefits under the AT&T Umbrella Benefit Plan No. 1 ("Plan"). The matter is before the court for a decision on the merits based on the parties' written submissions.[1]

The parties disagree as to the standard of review to be applied *(de novo* or abuse of discretion) as well as the proper result under either standard of review. They also disagree as to whether Brooks has exhausted plan remedies as to LTD benefits.

For the reasons set forth below, the court concludes that the denial of Brooks' claim for STD benefits should be reviewed under the abuse of discretion standard and, under that standard, should be upheld. Because an award (and exhaustion) of STD benefits is a prerequisite to an award of LTD

---

[1] It is undisputed that the benefits at issue were provided as part of an employee welfare benefit plan and that Brooks' sole remedy arises under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See, e.g.,* 29 U.S.C. § 1002(1) (defining employee welfare benefit plan); 29 U.S.C. § 1003 (providing ERISA's scope of coverage); 29 U.S.C. § 1132(a)(1)(B) and (g) (ERISA's remedial provisions). The parties have consented to resolution of this action on the merits based on their written submissions. *See* Dkt. No. 24 (Joint Stipulation).

benefits, this determination precludes any claim for LTD benefits. The court, therefore, directs entry of judgment for the Plan.

## DECISION OF THE COURT

Having fully considered the administrative record, relevant Plan documents, and the memoranda of the parties, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.

## FINDINGS OF FACT

Brooks was employed by AT&T Mobility, LLC ("AT&T Mobility") from March 2002 until February 23, 2012. As an employee of AT&T Mobility, Brooks participated in the Plan, which included a Disability Income Program ("DIP") component. *E.g.*, Dkt. No. 10 ¶ 5 (Am. Complaint); Dkt. No. 12 ¶ 5 (Answer to Am. Complaint ); Dkt. No. 24-4 (Plan documents).

The Plan was administered by AT&T Inc. ("Plan Administrator"). As explained in more detail below, the Plan Administrator delegated certain decision-making authority to a third-party Claims and Appeals Administrator. Dkt. No. 12 ¶ 5; DIP 43-44, 46.[2] The entity that filled both roles was Sedgwick Claims Management Service, Inc. ("Sedgwick"). *See infra* at 5 n. 3.

---

[2] The record of Brooks' claim and related plan documents have been filed as two collective exhibits in three electronic case filing ("ECF") attachments. *See* Dkt. Nos. 24-2, 24-3, 24-4. The first two of these ECF attachments (Dkt. Nos. 24-2 and 24-3) contain the administrative record ("AR"). The court identifies these documents by referring to the AR page number in the lower right hand corner of each page. Plan documents are contained in Dkt. No. 24-4. The most critical of the Plan documents consists of the Summary Plan Description for the DIP, which the court identifies by the DIP page number in the lower right-hand corner of each page.

2

## A.    Relevant Plan Provisions

### 1.    Overview of Benefits

The DIP provides ongoing income (ranging from 60 to 100% of pay) to eligible employees who become partially or totally disabled (as defined in the DIP) due to illness or injury. DIP 6. STD benefits begin on the eighth consecutive calendar day of full or partial absence from work as a result of an approved partial or total disability and continue for up to twenty-six weeks, provided the eligible employee remains partially or totally disabled. *Id.* If the disability continues beyond twenty-six weeks, the employee may be eligible for LTD benefits. *Id.* Thus, qualification for and exhaustion of STD benefits is a prerequisite to an award of LTD benefits. *See* DIP 23 (to be considered for LTD Benefits, an eligible employee must first "[r]eceive the maximum amount (26 weeks) of Short-Term Disability Benefits under the Program").

### 2.    Definition of Disability

The DIP defines disability as follows:

**When You Are Considered Disabled**

> You are considered disabled for purposes of Short-Term Disability Benefits if you are found by the Claims Administrator to be Totally Disabled or Partially Disabled.
>
> . . .
>
> You are considered Totally Disabled when, because of Illness or Injury, you are unable to perform all of the essential functions of your job or another available job assigned by your Participating Company with the same full-time or part-time classification for which you are qualified.
>
> . . .
>
> You are considered Partially Disabled when, because of Illness or Injury, you are unable to perform all of the essential functions of your job or another available job assigned by your Participating Company

3

> within the same full-time or part-time classification for which you are qualified, for the same number of hours that you were regularly scheduled to work before your Partial Disability.  No Short-Term Disability Benefits will be paid if you do not return to work when you are approved as Partially Disabled.

DIP 14-15.

In order to be considered for Short-Term Disability Benefits under the Program, an eligible employee must: "Be under the care of a Physician and follow his or her recommended treatment plan. The Claims Administrator will require that you periodically furnish satisfactory Medical Documentation of your Partial or Total Disability from your Physician."  DIP 15.

### 3.    Plan Administration and Grant of Discretion

The DIP provides as follows regarding plan administration:

> The Program is administered by AT&T.  However, AT&T has contracted with third parties for certain functions associated with this Program.
> . . .
> The *Claims Administrator* has been delegated authority by the Plan Administrator to determine whether a particular Eligible Employee who has filed a claim for benefits is entitled to benefits under the Program.
>
> The *Appeals Administrator* has been delegated authority by the Plan Administrator to determine whether a claim was properly decided by the Claims Administrator.
> . . .
> *The Plan Administrator (or, in matters delegated to third parties, the third party that has been so delegated) will have sole discretion to interpret the Program, including,* but not limited to, interpretation of the terms of the Program, *determinations of coverage and eligibility for benefits*, and determination of all relevant factual matters. Any determination made by the Plan Administrator or any delegated third party will not be overturned unless it is arbitrary and capricious.

4

DIP 44 (emphasis added).  The Plan Administrator, AT&T, Inc., delegated its decision-making authority to third-party Claims and Appeals Administrator Sedgwick, which administered the AT&T Integrated Disability Services Center  ("IDSC").  DIP 31-33, 42-46.[3]

### B.  Brooks' Claim and Medical Records

Brooks' first day of absence relevant to her STD claim was May 5, 2011, thereby making her potential "first day of disability" May 12, 2011.  AR 47.  Brooks remained out of work for a little over eight months, returning to work full time and for full duty on January 17, 2012.  *Id.*

On May 10, 2011, Sedgwick sent a letter and packet of documents to Brooks, confirming that her claim had been initiated and explaining, in detail, the standards and documentation necessary to support an award of benefits.  AR 57-86.  The letter advised Brooks as follows:  "medical information to substantiate your disability is due . . . by 05/20/2011."  AR 57.  It also advised Brooks that, "[t]o qualify for benefit payments under the AT&T disability plans, your medical condition should involve a sickness or injury, supported by medical documentation that prevents you from performing the duties of your job with or without reasonable accommodations."  AR 57.  The necessity for documentation of the disabling condition was emphasized including through the following statement:

---

[3]  Sedgwick is not named in the DIP Summary Plan Description.  That document does, however, clearly indicate that the Plan Administrator has delegated its authority to resolve claims and appeals (as well as its related discretion) to one or more third-party Claims and Appeals Administrators.  DIP 43-44. It is beyond dispute that Sedgwick fulfilled both roles, receiving claims and appeals through the address provided for the AT&T Integrated Disability Service Center ("IDSC") and responding using correspondence reflecting that letterhead and identifying Sedgwick as administrator of the IDSC.  *See, e.g.*, DIP 46 (directing participants to send claims and appeals to the IDSC and providing an address); AR 57-66 (benefit application packet with multiple documents bearing the letterhead "AT&T Integrated Disability Service Center . . . as administered by Sedgwick CMS"); AR169 (denial letter to Brooks bearing same letterhead).

It is important that both you and your treating provider understand that these forms, along with chart notes, diagnostic test results, hospital summaries, etc. specifically related to the reason [for] your absence should be returned regardless of the length of your disability.  It is critical that your physician demonstrates by his/her observations and clinical findings that you are unable to perform your work with or without accommodations.  This is the information, which will allow the case manager to make a determination of your eligibility for benefit payments under the AT&T disability plans.

AR 57.

On May 13, 2011, Brooks' supervisor, Sheila Crisostomo ("Crisostomo"), sent an e-mail to the Sedgwick employee handling Brooks' claim, Disability Specialist Ruben Mortera ("Disability Specialist Mortera" or "Mortera").  The e-mail contained information regarding Brooks' duties as a Retail Account Executive including a description of the physical requirements, which were classified as "moderate."  AR 9-10.

On May 20, 2011, Brooks' primary care physician, Dr. David Fisher, sent an eleven-page facsimile to Sedgwick.  AR 93-103.  The facsimile contained only two pages of medical documentation: a one-page "Initial Physician Statement" dated May 19, 2011, and a one-page office note reflecting an doctor's visit on May 6, 2011. AR 100, 101.[4]

On the Initial Physician Statement, Dr. Fisher indicated that the "Diagnosis current and contributing" for Brooks was "Sjogren's Syndrome 710.2; Hypothyroidism 244.9; Raynaud's 433; [and] Fatigue 780.79." AR 100.  The form listed the following symptoms *reported by the patient*: "profound fatigue; slowed mentation."   Under "Observed clinical findings[,]" Dr. Fisher listed "depressed mood."  Dr. Fisher indicated that the current plan of treatment was "Prednisone, B12 injections," and a possible prescription of Plaquenil.  In response to a query whether the plan of

---

[4] The remaining pages consisted of multiple copies of instructions and signed and unsigned authorization forms.

treatment was expected to improve Brooks' condition, Dr. Fisher wrote: "yes, but may take 4-6 wks to elicit improvement in symptoms." AR 100. In response to a request for "date and description of treatment during the past three months[,]" Dr. Fisher wrote "5/19/11, 5/6/11[.]" He provided no response to the query: "Are there current functional restrictions? If yes, what are they and what is the anticipated duration of the restrictions?" Under a section for "Additional Comments," Dr. Fisher wrote: "OOW 5/6/11 - 6/21/11." In context, the letters "OOW" appear to stand for "out of work," as the dates indicated are consistent with Dr. Fisher's statement that improvement might be expected within four to six weeks. AR 100.

The office note from Brooks' visit to Dr. Fisher on May 6, 2011, thirteen days before the Initial Physician's Statement was completed, provides little additional information. AR 101. It reads, in full, as follows:

> S:      Ms. Brooks is a 28-year-old who presents today to follow up on her history of Sjogren's syndrome and hypothyroidism with previous thyroiditis. She stopped taking Plaquenil from Dr. Fant, her rheumatologist, because of adverse side effects, but she is having what she feels like is an exacerbation of Sjogren's or thyroiditis with profound fatigue.
>
> O:      BP 112/66, pulse 74, WT 120. Her mood and affect are appropriate. No thyromegaly. Heart is RR. Lungs are clear.
>
> LABS:        I am checking her thyroid and antibodies.
>
> A:      Sjogren's syndrome and hypothyroidism with previous thyroiditis.
>
> P:      Armour Thyroid 120 mb one q.d. #90 x 1 refill. Armour Thyroid 30 mg q.d., #90 x 1 refill, and I put her on a Sterapred 5 mg 6-day dosepak for Sjogren's flare. I will notify her if her thyroid hormones or antibodies are abnormal. Otherwise, We will see her back in six months with fasting labs a week prior and p.r.n.

AR 101.

7

Thus, like the May 19, 2011 Initial Physician Statement, this May 6, 2011 office visit note primarily documents Brooks' subjective ("S:") report of what she believed was an exacerbation of Sjorgen's syndrome with "profound fatigue." The objective ("O:") and assessment ("A:") sections do not mention any functional limitations or necessity for an absence from work. Neither does the May 6, 2011 office note refer to observation of a depressed mood (as noted on the Initial Physician Statement). Instead, the note of the May 6, 2011 office visit refers to Brooks' mood and affect as "appropriate." Further, while the May 6, 2011 office visit note refers to requested laboratory work, no results were provided with the claim. Neither are any laboratory results mentioned in the accompanying May 19, 2011, Initial Physician Statement.

### C.    Initial Claim Review and Denial

On or about May 25, 2011, Sedgwick assigned medical review of Brooks' claim to David L. Hinkamp, M.D., a board-certified occupation/environmental medicine physician.[5] AR 15-17. Dr. Hinkamp completed his review of Brooks' record and claim by May 31, 2011, and summarized his conclusions as follows:

> The medical notes document that the [employee] was seen 05/06/11 with a history of Sjogren's syndrome and hypothyroidism. Reportedly, the [employee] stopped taking plaquenil that was prescribed by her Rheumatologist because of adverse side effects, but she was having what she felt was an exacerbation of Sjogren's or thyroiditis with profound fatigue. On examination there were no abnormalities noted. Dr. Fisher then noted that he was checking her thyroid and antibodies.
>
> No results from those evaluations or follow up are found. There are no activity cautions or orders for bed rest. I was unable to speak with Dr. Fisher to obtain further information.

---

[5] For purposes of this order, the court assumes Dr. Hinkamp was an employee of Sedgwick.

AR 000016. Dr. Hinkamp concluded that there was justification for Brooks' absence from work from May 5-11, 2011, "to allow time for planned evaluation of [her] chronic disorders" but "insufficient objective medical findings to support an inability to perform moderate work activities 05/12/11 through present." AR 16-17.[6]

As reflected in his above-quoted statement, Dr. Hinkamp did not consult with Dr. Fisher before concluding that Brooks' medical record did not "support an inability to perform moderate work" during the relevant period. Disability Specialist Mortera had, however, made several unsuccessful attempts to set up such a call.[7] Contrary to Brooks' argument, the court does not find any statement by Dr. Hinkamp constitutes an intentionally false statement regarding these unsuccessful attempts.[8]

---

[6] Dr. Hinkamp had only the note of the May 6, 2011 office visit and the May 19, 2011 Initial Physician's Statement when he prepared this report. He did not have the note of Brook's May 19, 2011 office visit, which includes an observation of some depression and includes an assessment of "fatigue and concentration difficulties." *See* AR 142 (discussed *infra* n. 11). That document was not submitted to the Plan until after the initial denial of the claim.

[7] Computer notes refer to this individual as "MORTERAR."

[8] Brooks argues that Dr. Hinkamp's review was "neither reasoned or principled" because he "made up a reason to justify not making a phone call to Ms. Brooks' physician[.]" Dkt. No. 26 at 6. The alleged "made up . . . reason" is a statement found in a May 31, 2011, computer note that reads as follows: "Date and Time calls made to [treating physicians]: No call made. The [Claim Manager] noted that the [treating physician] is *not willing* to speak with the [physician advisor]." AR 15 (emphasis added). This notation is entered by "STWARD[,]" and may or may not represent a direct statement from Hinkamp. Language later in the same entry does, however, appear to represent a personal statement by Hinkamp on the subject: "*I was unable* to speak with Dr. Fisher to obtain further information." AR 16 (emphasis added).

In light of the evidence discussed below, the court does not find Dr. Hinkamp's statements (assuming both are attributable to him) regarding the reason for his failure to speak to Dr. Fisher to be intentionally false or suggestive of an improper motive. At worst, they suggest an incomplete understanding of what transpired during one of the unsuccessful attempts by the Disability Specialist to arrange a telephone conference between Dr. Hinkamp and Dr. Fisher.

Notes of activity on the claim predating Dr. Hinkamp's determination that Brooks was not disabled indicate attempts were made by Disability Specialist Mortera to arrange a teleconference

(continued...)

On June 8, 2011, Sedgwick sent Brooks a letter which stated that "after a careful and thorough review of your request for payment of short term disability benefits under the AT&T Disability Income Program (DIP), it has been determined that your claim does not qualify for payment. As a result, benefits are denied effective 05/12/2011 through your return to work date." AR 104. The letter advised Brooks that the decision to deny benefits was based on a review of medical documentation provided by Dr. Fisher dated May 6, 2011, and May 19, 2011, and an unsuccessful attempt by the Physician Advisor (Dr. Hinkamp) to contact Dr. Fisher to discuss Brooks' medical information. It also indicated that the Physician Advisor determined, based on the available records, that the clinical information lacked clear findings that Brooks was prevented from performing the essential functions of her occupation. AR 104-05. Finally, the letter informed Brooks both of her right to appeal (and how to do so) and her right to seek judicial review if the appeal was denied. AR 105. Appeal forms were included with the denial letter. AR 107-10.[9]

---

[8](...continued)
between Dr. Fisher and the physician advisor. The notation of the first call to Dr. Fisher's officeeads as follows: "spoke to Janet, no info over phone, need to send formal request to fax[.]" AR 8 (May 11, 2011 call). A note relating to a subsequent call to see if the faxed request was received resulted in no answer after fifteen rings and no option to leave a voice mail. AR 9 (May 13, 2011 call). A May 23 note indicates records were received on May 20. AR 12. Notes on the following day, May 24, indicate the phone rang fifteen times without answer or option to leave a voice mail. AR 13. The note on which Brooks relies to argue that Dr. Hinkamp misrepresented what occurred was entered the following day and states that Mortera "spoke with Chris office manager and advised attempt to schedule teleconference, she stated Dr. Fisher is not in the office and will be out until next Tuesday 05/31. DS asked if anyone else could participate in teleconference and she stated no, it would have to be Dr. Fisher." AR 13-14 (May 25 note). This notation leaves open the possibility that Dr. Fisher would have discussed Brooks' condition with Dr. Hinkamp if he had called on or after May 31, 2011.

[9] It appears Brooks was advised of the denial by phone before the date referenced on this letter. *See* AR 19 (computer note of June 2, 2011 telephone conversation between Disability Specialist Mortera and Brooks, indicating Brooks was informed of the denial, the reasons for the denial, and the type information needed for a successful appeal).

On or about June 20, 2011, Brooks filled out and signed the "IDSC Quality Review Unit Appeal Form" and returned it soon thereafter, along with supporting documents, to the IDSC Quality Review Unit (run by Sedgwick).  AR 119.  The supporting documents included the following:

- a five-page letter from Brooks describing significant difficulties she was experiencing performing daily tasks (AR 120-24);

- a one-page letter from Brooks to Dr. Fant advising what she needs from him for the appeal (AR 125);

- Dr. Fant's one-page responsive letter (AR 126 – discussed below);

- Dr. Fant's records of Brooks' visits on July 6, 2010, November 8, 2010, May 9, 2011, and June 9, 2011 (AR 127-35);

- Laboratory reports for July 9, 2010, and June 10, 2011 (AR 136-39) (presumably ordered by Dr. Fant as they correspond with dates of Brooks' office visits with him)[10];

- Dr. Fisher's office notes for Brooks' visits on January 27, 2011, May 6, 2011, and May 19, 2011 (AR 142-43, 145)[11];

---

[10]  The June 10, 2011 laboratory report relates to the relevant period and reflects a low TSH level, which a hand notation indicates shows "over replacement of thyroid hormone."  AR 136.

[11]  Of Dr. Fisher's records, only the notes of the May 6 and 19, 2011 office visits and a May 6, 2011 lab report fall within the relevant period.  The notes of the May 6, 2011 visit were previously provided to the Plan and are discussed above.  The notes of the May 19, 2011 visit state Brooks reported "feel[ing] like she cannot perform her job duties without errors.  So, she is here to discuss having short-term out-of-work forms completed."  AR 142.  Observations include "BP 112/66, pulse 74, WT 120.  She is alert but seems a bit depressed or down, mainly because she said she is so fatigued.  She has no thyromegaly.  Heart is RR.  We gave her a B12 shot today."  *Id.*  The remaining sections read as follows:

A:    Sjogren's syndrome exacerbation with fatigue and concentration difficulties.

P:    Out-of-work from 05/06/11 through 06/21/11.  I would like her to return in a month to recheck labs after she completes Prednisone 10 mg taper of four pills q.d. x 5 days, then three pills q/d/ x 5 days, then two pills q.d. x 5 days, and one pill q.d. x 2 weeks.

(continued...)

- A laboratory report prepared by Dr. Fisher's practice for May 6, 2011 (AR 144)[12];

- Several laboratory reports and one radiology report from 2010 and earlier (AR 146-49).

AR 119-50.

The most critical of these documents is Dr. Fant's June 24, 2011 letter, which is addressed to Brooks but advises her to use it as she sees fit.[13]  AR 126.  The letter states that Dr. Fant had seen Brooks on four occasions:  July 6, 2010; November 8, 2010; May 9, 2011; and June 9, 2011.  AR 126.[14]  It also confirms that Dr. Fant was treating Brooks "for a systemic autoimmune disorder, Sjogrens syndrome, which has resulted in dry eyes, salivary gland enlargement, and severe fatigue." *Id.* (also noting that Sjogrens syndrome "nearly always results in fatigue which, not uncommonly, can be debilitative.").  *Id.*  It concludes by "request[ing] that those who will be examining your

---

[11](...continued)
*Id.*  Thus, this note is consistent with Dr. Fisher's Initial Physician's statement in suggesting that Brooks needed to be out of work from May 6, 2011, to June 21, 2011.  It also includes an assessment of "Sjogren's syndrome exacerbation with fatigue and concentration difficulties."

[12]  This report addresses thyroid function and indicates three thyroid measures which were out of the normal range including TSH III of .20 (with a normal range listed as .27 to 4.20).  AR 144.  A metabolic panel performed a month later (presumably for Dr. Fant) reports TSH of .045 (with a normal range listed as .35 to 4.5).  AR 136.  Hand written notes on the later report state the report indicates an *over replacement* of thyroid.

[13]  In her memorandum, Brooks specifically refers to three medical records:  Dr. Fant's letter and two laboratory reports, AR 140 and AR 144.  The first of the two referenced laboratory reports (AR 140) is dated July 9, 2010 (ten months prior to her claimed disability period), and is relevant only in that it supports Brooks' diagnosis for Sjogren's syndrone.  The second referenced laboratory report (AR 144) covers the thyroid panel performed for Dr. Fisher on May 6, 2011.  As noted above, any thyroid deficiency reflected in this report was overcorrected by June 10, 2011.  Thus, AR 144 suggests a thyroid deficiency that was correctable with medication.  No physician has, in any event, opined that Brooks was disabled by her thyroid condition.

[14]  Only the visits in May and June 2011 occurred during the period for which disability benefits are sought (or the immediately preceding sick leave period).

appeal for short term disability give favorable consideration to your request." He also states he is available "to answer questions regarding your case that these examiners may have[.]"

Corresponding notes relating to Brooks' June 9, 2011 office visit with Dr. Fant refer to Brooks' complaints of fatigue, mental difficulties, and low grade fever. AR 127. These notes also include what appears to be a finding of "fatigue, severe," as well as a reference to depression. AR 128. Under "plan." the notes indicate Brooks should "allow an additional 4-8 weeks for Plaquenil to begin to work" and should return for a follow up appointment in eight weeks. The note does not appear to contain any specific functional limitations or express statement that Brooks needed to be out of work. In contrast, as noted above, Dr. Fant's June 24, 2011 letter suggests support for her claim that she is unable to work, although it, too, does not expressly state that Brooks needs to be out of work.

The appeal was assigned to Carla Persley ("Persley"), Appeals Specialist. On July 12, 2011, Persley sent a request to Crisostomo (Brooks' supervisor), for a detailed job description for the Retail Account Executive position held by Brooks. AR 156-57. Crisostomo responded on the following day, July 13, 2011, providing a three-page job description and listing the following physical requirements of the position:

* Avg work day is 8 hrs:

* Driving - 15%

* Standing - 40% (in acct visits w/sales persons/customers)

* Sitting - 35% (to access internal email, reporting & other tasks)

* Lifting/Carrying - laptop, notebook (10 lbs) - 5% (carry in and out of account visits)

AR 156-60.

13

Persley spoke with Brooks by phone on July 13, 2011. AR 28. Persley's notes indicate she returned a call from Brooks, advising Brooks of the status of the appeal as well as Brooks' option to file suit in the event the denial was upheld on appeal.[15]

On August 1, 2011, Persley sent a request for a review of Brooks' claim to an External Physician Advisor. AR 162-64. This request asks the physician to address a number of specific questions concerning Brooks' disability status. *Id*.

D. Dennis Payne, Jr., M.D., a board-certified specialist in internal medicine and rheumatology, responded to this request. AR 165-67. In addition to reviewing the documents submitted in support of Brooks appeal, Dr. Payne made a limited attempt to contact Brooks' two treating physicians (Drs. Fisher and Fant), leaving each a message to call back within twenty-four hours or the decision would be made solely based on the written record. *Id*. There is no indication either physician called back within the specified period or at any subsequent time.[16]

---

[15]  The referenced notation indicates that Persley returned a call from Brooks, and addressed a variety of subjects including the appeal process. It also indicates Persley advised Brooks "the appeal decision is final, next step is to, FILE SUIT if she chooses after this appeal decision is rendered." RA 28. Brooks argues that this notation suggests irregularities in the appeal process because discussion of the post-appeal right to file suit suggests the decision on appeal was predetermined, even though no final decision issued until October 4, 2011. Dkt. No. 26 at 7.

The court disagrees with Brooks' interpretation of the evidence. Persley may simply have been thorough, advising Brooks of her options in the event the appeal was denied. She may also have been responding to a specific inquiry from Brooks regarding her options in the event the appeal was denied. Either possibility is at least as likely as a predetermination of the appeal. Subsequent actions by Sedgwick, acting through Persley, including obtaining two independent medical reviews of the claim by specialists in the relevant fields, are, moreover, inconsistent with Brooks' suggestion that denial of the appeal was a foregone conclusion.

[16]  Brooks questions the reasonableness of Dr. Payne's review based primarily on his failure to give Brooks' treating physicians more than twenty-four hours to return his calls before he would make his recommendation on the records submitted. Dkt. No. 26 at 7-8 (noting Dr. Payne contacted both physicians' offices, leaving messages "he would submit his report without consultation" if he did not hear back from them within twenty-four hours).

14

On August 9, 2011, Dr. Payne provided a report based on his review of Brooks' medical records. AR 164-67. This report concludes that, "[b]ased on the medical record data provided for review, the employee is not disabled from her regular job from any rheumatological process for the above noted time period." AR 166. Dr. Payne explained the basis of his decision as follows:

> I have carried out a complete and thorough review of the medical record data provided in this case. There is mention of chronic pain with fatigue and multiple nonspecific cognitive complaints in the setting of mild SICCA symptoms that are not particularly destructive involving the eyes and the mouth. Her serological testing is supportive of a possible immunological basis with the positive ANA and positive SSA antibody. Her other testing is completely normal other than equivocal right parotid enlargement on a CT scan. The examination findings are essentially unremarkable with minimal findings that would support restrictions or limitations. Summarizing, from a rheumatology viewpoint, there are no objective data provided in this case that would support that the degree of Sjögren's activity is present or any other rheumatic process is present in this case that is producing any impairment in function. Therefore, unrestricted work would be her expected capability.

AR 167.

At Sedgwick's request, Dr. Dennis Payne subsequently reviewed additional documentation consisting of Brooks' job description (AR 156-60) and Brooks' personal letter describing her difficulties with daily living (AR 120-25). *See* AR 172. In his supplemental report, Dr. Payne stated that his "findings [were] unchanged" by this additional information. AR 172-73 (report dated August 26, 2011). Dr. Payne explained: "I do not find any evidence of any rheumatological process or syndrome that would be restricting or limiting in her care. Therefore, she would be expected to be capable of unrestricted work from a rheumatology perspective during the time period under review." AR 173.[17]

---

[17] There is one erroneous assumption in the supplemental report. Specifically, Dr. Payne refers to Brooks' position as "sedentary" when all other evidence indicates the physical requirements of her job are "moderate." While Brooks is correct in noting this was a "flawed assumption" (Dkt. No. 26 at 9-10), it does not appear significant given that Dr. Payne found Brooks was "capable of *unrestricted work* from a rheumatology perspective during the time period under review." AR 173 (emphasis added).

Sedgwick also arranged for Brooks' medical records to be reviewed by Paul Giannandrea, M.D., who is board-certified in psychiatry and neurology. AR 174-77 (report dated August 26, 2011). Dr. Giannandrea's "Psychiatric Synopsis" indicates he reviewed all of Brooks' medical records, her job description, and her personal letter describing her difficulties. AR 176. Based on this review, Dr. Giannandrea concluded "the employee is not disabled from her regular job from a psychiatric perspective as of 05/12/11 through present." *Id.* With respect to clinical findings, Dr. Giannandrea stated:

> The patient has fatigue, dryness of her eyes, weakness, and other symptoms that are related to her medical problems and she also has some evidence of stress and depression. However, there is little psychiatric symptomatology documented. Disability from her regular job during the time period under review is not supported from a psychiatric perspective.

*Id.*

Each of the three physicians involved in the review process included the following conflict of interest attestation:. "I attest . . . that there is no conflict of interest with this review for referring entity, benefit plan, enrollee/consumer, attending provider, facility, drug, device, or procedure. I attest that my compensation is not dependent on the specific outcome of my review." AR 17 (Dr. Hinkamp); AR 173 (Dr. Payne); AR 177 (Dr. Giannandrea).

A draft letter denying the appeal was prepared on August 31, 2011, and sent for final review. AR34. The final letter denying the appeal was sent to Brooks on October 4, 2011. AR 36; AR 184-86. This denial letter summarizes the conclusions of Drs. Payne and Giannandrea and documents the attempts to contact Brooks' treating physicians, Drs. Fisher and Fant. It also notes that: "Although some findings are referenced, none are documented to be so severe as to prevent you from performing the duties of your job as Retail Account Executive, with or without reasonable accommodation from May 12, 2011 through present." AR 185. The letter concludes by advising

16

Brooks of her right under ERISA to bring a lawsuit against the Plan as she had exhausted her plan remedies as to her STD claim. AR 185.

## CONCLUSIONS OF LAW

### A.    Standard of Review

Brooks does not appear to dispute that her claim would properly be reviewed under an abuse of discretion standard of review if the final decision was made by the Plan Administrator or a properly designated "Claims Administrator" or "Appeals Administrator." *See* Dkt. No. 26 at 3 (Brooks' quotation of DIP 32, 42-43).[18] As the language Brooks quotes reveals: "The Plan Administrator has delegated discretion and authority to decide appeals to the Appeals Administrator . . . [which has] full and exclusive authority and discretion to grant and deny appeals under the Program. The decision of the Appeals Administrator regarding any appeal will be final and conclusive." *Id.*

Brooks argues that this grant of discretion is inapplicable to her STD claim because the entity which made both the claim and appeal decisions, Sedgwick, is not the properly designated Appeals Administrator. Brooks bases this argument on language in the summary plan description which advises participants to direct claims and appeals to the "AT&T Integrated Disability Service Center." Dkt. No. 26 at 4. She also, presumably, relies on the absence of any express identification of Sedgwick in the Plan documents.

The court is not persuaded by this argument. First, while the Plan documents may not refer expressly to Sedgwick, they clearly delegate the Plan Administrator's discretion to a third-party

---

[18] Brooks refers to this document as the "Summary Plan Description" or "SPD" and attaches a copy to her memorandum. Except for the absence of the DIP page numbers, the SPD appears to be identical to the document in the joint exhibit bearing DIP page numbers. The court, therefore, refers to the document contained in the joint exhibit.

17

Claims and Appeals Administrator. *See, e.g.,* Dkt. No. 24-4 at 44 ("The Plan Administrator, or in matters delegated to third parties, the third party that has been so delegated will have sole discretion to interpret the Program, including but not limited to, . . . determinations of coverage and eligibility for benefits, and determination of all relevant factual matters.").    It is also abundantly clear from the record that Sedgwick, in fact, served as the designated Claims and Appeals Administrator, acting through the AT&T Integrated Disability Service Center. *See, e.g.,* Dkt. No. 24-2 at 56, 57, 58 (letters from "AT&T Integrated Disability Service Center *As Administered by Sedgwick CMS*"). Brooks has presented no evidence to the contrary. Neither has Brooks directed the court to any authority that would suggest AT&T was required to name its third-party Claims and Appeals Administrator within the SPD or other specific Plan document in order to delegate discretion to this third party.

The court, therefore, concludes that the denial of Brooks' claim (and appeal) should be reviewed under the abuse of discretion standard of review. Under this standard, the court is required to uphold the administrator's decision if it is reasonable, even if the court would have reached a different conclusion had it considered the matter independently. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). A decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id*. at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)); *see also DuPerry v. Live Ins. Co. of N. Am.*, 632 F.3 860, 869 (4th Cir. 2011) (citing same standard).

In deciding whether the decision satisfies this "reasonableness" standard, the court considers the following eight factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with

the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*See Champion v. Black & Decker*, 550 F.3d 335, 359 (4th Cir. 2008) (quoting *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir. 2001)).

**B.      The Process Was Deliberate, Reasoned, and Not Affected by Any Conflict of Interest**

The evidence demonstrates that the Plan, through Sedgwick which served as both the designated third-party Claims Administrator and Appeals Administrator, engaged in a deliberate and reasoned process in reviewing Brooks' initial claim and appeal. For example, Sedgwick sent appropriate forms and instructions to Brooks to assist her in filing her claims. The instructions emphasized the need for supporting medical documentation and included a specific request for a detailed statement of any functional limitations.

Brooks' claim was submitted with minimal documentary support. That support consisted of the single-page Initial Physician Statement signed by her primary care physician, Dr. Fisher, on May 19, 2011, and a report of a single visit to the same doctor on May 6, 2011. Neither the form nor the report indicated a medical finding of any specific functional limitations. In addition, critical inquiries on the form were left unanswered. Both did, however, refer to Brooks' self-report of "profound fatigue."

This minimal documentation was reviewed by an in-house Physician Advisor, Dr. Hinkamp, who concluded that the record was insufficient to support Brooks' claim of disability.[19] Dr. Hinkamp set out his reasoning, which was subsequently shared with Brooks in the denial letter. The

---

[19] Dr. Fisher's notes of Brooks' May 19, 2011 visit were not provided with the initial claim. Thus, additional support found in this later note (including Brooks' subjective report of "slow mentation," Dr. Fisher's observation of a depressed mood," and his assessment of "fatigue and concentration difficulties") was not available to Dr. Hinkamp when he made his recommendation.

letter disclosed that the evidence was insufficient to establish disability.  It also disclosed that the claims administrator had been unable to speak with (and consequently obtain additional information from) Dr. Fisher.  The court finds this process, which resulted in the initial denial, deliberate, reasoned, and uninfected by any conflict of interest.[20]

The Plan, through Sedgwick, appropriately informed Brooks of her right to appeal and provided forms and guidance as to how to perfect her appeal.  Additional support Brooks offered from Dr. Fisher consisted of notes from two additional office visits and a few lab reports.  One of the new office visit notes (for May 19, 2011) and one lab report (dated May 6, 2011) related to the period for which disability benefits are sought.  The May 6, 2011 lab report indicated certain thyroid abnormalities, which, as noted above, do not appear to support a claim of disability.  The May 19, 2011 doctor's visit note indicated the primary purpose of Brooks' visit was to obtain "short-term out-of-work forms completed."  AR 142.[21]  Treatment provided on that date consists of a B12 shot and a short, tapering course of Prednisone.  There is a notation that Brooks "seem[ed] a bit depressed or down mainly because she said she is so fatigued" and a diagnosis of "Sjogren's syndrome exacerbation with fatigue and concentration difficulties."  *Id.*  The plan at that point was for Brooks to be "[o]ut of work from 05/06/11 through 06/21/11."

In addition to the medical records from Dr. Fisher, Brooks offered a personal letter detailing her difficulties, a letter from rheumatologist Dr. Fant, and medical records or lab reports relating to Dr. Fant's care.  The letter from Dr. Fant stated both that Brooks had a condition which could cause

---

[20]  Dr. Hinkamp signed an attestation that he was acting without conflict of interest.  Brooks has pointed to no evidence which would draw that attestation into doubt.

[21]  This doctor's visit note corresponds with the date Dr. Fisher completed the Initial Physician Statement that was submitted with Brooks' initial claim.

disabling fatigue and that she was experiencing severe fatigue.   It also requested that the reviewers "give favorable consideration" to her appeal of the denial of STD benefits.

Sedgwick sent this documentation to two independent physicians with relevant specialties (rheumatology and psychiatry) for review.  Both physicians reviewed the available documentation and found it insufficient to demonstrate that Brooks had functional limitations within the physician's area of specialization.   Each provided a written rationale for his opinion which appears, on its face, to be well reasoned and well supported.[22]   Each also signed an attestation that he had no conflict of interest.

Brooks has not directed the court to any evidence which would suggest that (1) the records should have been reviewed by a specialist in some other field; (2) either reviewer failed to fully consider all information which Brooks provided; or (3) either reviewer had a conflict of interest. Instead, she points to a few minor inconsistencies or errors that she suggests indicate some improper motive or insufficiency in the review.  Considered in context of the full record, however, the alleged inconsistencies or errors are insignificant.  They do not, in any event, suggest that the process itself was less than deliberate and reasoned or was infected by improper motive.[23]

---

[22] Dr. Payne reviewed Brooks' record from the perspective of a board certified internist and rheumatologist and concluded that Brooks would be "capable of unrestricted work." AR 173.  Dr. Giannandrea reviewed Brooks' record from the perspective of an expert in psychiatry and neurology. AR 175-77.  Dr. Giannandrea concluded that Brooks had "some evidence of stress and depression, but none was delineated in a specific disorder and/or did not appear to be primary or independent of her medical problems. Thus, the provided medical documentation does not support a disabling psychiatric condition that would preclude her from her regular work during the time period under review."  AR 177.

[23] A number of the alleged inconsistencies or errors relate to Dr. Hinkamp's review.  That review is not, however, relevant to the review conducted during the appeal process, which was the basis for the Plan's ultimate decision.

For example, Brooks suggests error because Drs. Payne and Giannandrea made only limited attempts to contact the treating physicians for additional information, giving them only twenty-four hours to respond to calls before a recommendation would be made. The more significant point is that the reviewers each made such an attempt and neither received any response, including a request for additional time from either of Brooks' treating physicians. Brooks has offered nothing that suggests more was required for the Appeals Administrator's actions (or those of its independent medical reviewers) to be reasonable.

For reasons explained above, the court finds the process was reasoned, principled, and not affected by any conflict of interest at both the claim and, more critically, the appeal stage.

### C.    Sufficiency of evidence to support decision

In her memorandum, Brooks relies on three specific medical records: Dr. Fant's letter and two lab reports. Dr. Fant's letter provides some support for Brooks' claim of disability, although it describes no specific functional limitations.[24] It was not, however, unreasonable for the Plan to look beyond this letter to underlying medical records for specific findings and functional limitations. Two physicians with expertise in the relevant fields reviewed the records for this purpose and found insufficient support for Brooks' claim. While Brooks' treating physicians noted symptoms of fatigue, concentration difficulties and depressed mood, diagnosed Sjorgren's syndrome (which Dr. Fant noted may cause debilitating fatigue), listed plans which adjusted medication and (at least Dr.

---

[24]  Dr. Fant's letter includes the following statements: (1) he is treating Brooks for various conditions including a "systemic autoimmune disorder, Sjorgrens syndrome" and "severe fatigue," (2) "systemic inflammation [associated with autoimmune disorders] nearly always results in fatigue which, not uncommonly, can be debilitative"; (3) Brooks began taking Plaquenil for treatment of her Sjorgren's syndrome a month prior to her June 9, 2011 visit, but "[s]everal months are typically required for this medication to take effect"; and he "request[s] that those who will be examining [Brooks'] appeal for short term disability give favorable consideration to [her] request."  AR 126.

Fisher) indicated out-of-work dates, and prepared a form (Dr. Fisher) or letter (Dr. Fant) supportive of disability, neither explained what functional limitations prevented Brooks from returning to work.

The referenced lab reports, likewise, fail to support Brooks' position. While one supports the diagnosis of Sjogren's syndrome, it does not support a finding of disability because it relates to an earlier time period when Brooks was able to perform her job. The lab report during the relevant period relates to thyroid measures. There is, however, no evidence that Brooks' thyroid condition was disabling. Certainly neither of her treating physicians offered such an opinion.

While the Plan might have reached a different conclusion based on the evidence submitted, the court cannot, on this record, find that it abused its discretion in concluding that Brooks did not meet the Plan's definition of disability.

### CONCLUSION

For the reasons set forth above, the Plan's motion for judgment is granted and Brooks' motion for judgment is denied. Because the decision affirms the denial of benefits, and in light of the relative resources of the parties, the court declines to award attorneys' fees to either party. The Clerk of Court is directed to enter judgment in Defendant's favor.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
November 5, 2013